An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA25-68

Filed 20 August 2025

Forsyth County, No. 23JT000066-330

IN THE MATTER OF:

T.J., Jr.

Appeal by respondent-appellant-mother and respondent-appellant-father from order entered 28 August 2024 by Judge Thomas W. Davis, V, in Forsyth County District Court. Heard in the Court of Appeals 10 June 2025.

> *Forsyth County Department of Social Services, by Theresa A. Boucher, for petitioner-appellee.*
>
> *Vitrano Law Offices, PLLC, by Sean P. Vitrano, for respondent-appellant-mother.*
>
> *Richard Croutharmel, for respondent-appellant-father.*
>
> *Michelle FormyDuval Lynch, for appellee Guardian Ad Litem.*

GORE, Judge.

Respondent-mother and respondent-father separately appeal the termination of their parental rights to Thomas.[1]  Upon review of the briefs and the record, we affirm.

**I.**

Thomas was born in December 2022.  Forsyth County Department of Social Services ("DSS") sought and obtained custody in April 2023 when Thomas was three months old due to injuries of brain trauma, a skull fracture, subarachnoid hemorrhages, and facial and chest abrasions and bruising.  Additionally, a Child Medical Evaluation revealed Thomas had thirteen healing rib fractures and healing fractures on both forearms.  At the time DSS was notified and obtained custody of Thomas, respondent-father was incarcerated in the Forsyth County Detention Center, where he had been for nearly a year.

At the adjudication hearing, the trial court found that respondent-mother gave inconsistent and implausible accounts to explain Thomas's multiple injuries, such as a toddler hitting Thomas with a toy, or that she was in a car accident with Thomas, fled the scene, and did not seek medical attention.  Medical personnel communicated that the injuries were not all from the same trauma because of the differing healing stages that were evident through testing.  They diagnosed him with nonaccidental trauma/abuse.  Respondent-father told the court he visited with his son every other

---

[1] A pseudonym is used to protect the juvenile's identity and for ease of reading.

week and had daily phone calls with Thomas's caregivers prior to DSS obtaining custody.

The trial court adjudicated Thomas to be abused and neglected in August 2023. The trial court ordered respondent-mother to do the following to seek reunification with Thomas: submit to random drug screens, maintain sobriety for at least six months, attend substance abuse and mental health treatments, complete a domestic violence assessment and follow recommendations, maintain safe and stable housing and financial means to support her children, complete parenting classes and demonstrate skills learned, work with a parenting coach, and submit an explanation for how Thomas sustained his multiple injuries. Respondent-father was ordered to do the following for reunification with Thomas: complete parenting classes and demonstrate these skills to ensure Thomas's safety; complete substance abuse and mental health evaluations and follow all recommendations; complete domestic violence classes and demonstrate ability to provide Thomas with an environment free of domestic violence; demonstrate six months of sobriety by submitting to random drug screens; meet the basic therapeutic needs of his child, obtain safe and stable housing; provide an explanation of how Thomas sustained such serious injuries; upon release from incarceration, complete a Parenting Capacity Assessment/Psychological Evaluation and follow any recommendations; and upon release from incarceration, exercise consistent visitation with his child.

At the permanency planning hearings, the court determined respondent-father had not made any progress on his case plan for reunification. Respondent-father was relocated to a different prison while Thomas was in DSS's custody, but both prisons had resources available to complete some of his case plan. Respondent-father acknowledged awareness of his ability to participate in the services at the prison but stated he did not participate because he could not read or write. Respondent-father made little effort to contact Thomas through DSS. Respondent-father continued to engage in domestic violence with respondent-mother.

The trial court found that respondent-mother had complied with her case plan in part but lacked stable employment. It found that she maintained a relationship with respondent-father despite continued domestic violence; she was charged with felony organized retail theft; she continued to smoke marijuana while pregnant again; she invited a man to her home she recently met to smoke marijuana and have sex, and she reported "he made her consume cocaine and have sex with him." The trial court also found that the man she reported is a registered sex offender and is the putative father of her recent pregnancy. Additionally, she had multiple positive drug screens consisting of marijuana, methamphetamine, and cocaine, and she failed to provide a plausible explanation for Thomas's life-threatening injuries despite court orders to do so. The trial court also acknowledged the previous termination of respondents' parental rights to their older children.

The trial court relieved DSS of reunification efforts and directed DSS to petition for termination of parental rights. DSS filed a petition for termination of parental rights and served both respondent-father and respondent-mother. The termination hearing occurred in July 2024, and the trial court entered multiple findings of fact and concluded that grounds existed to terminate respondent-mother's parental rights pursuant to section 7B-1111(a)(1) and (2); and it concluded grounds existed to terminate respondent-father's parental rights pursuant to sections 7B-1111(a)(1), (2), and (5). Respondent-father and respondent-mother separately and timely appealed the termination order.

**II.**

Respondents separately appeal the order terminating their parental rights pursuant to N.C.G.S. § 7A-27(b)(2) and N.C.G.S. § 7B-1001(a)(7). Respondent-mother argues the trial court erred by concluding grounds existed to terminate her parental rights pursuant to N.C.G.S. § 7B-1111(a)(1) and (9). She also seeks remand for the trial court to correct an alleged clerical error in the order. Respondent-father argues the trial court erred by concluding grounds existed to terminate his parental rights pursuant to N.C.G.S. § 7B-1111(a)(1), (2), (5), (7), and (9) because the findings did not support its conclusions of law, and because the trial court misinterpreted the law by concluding certain grounds existed for termination.

Petitioner must prove by "clear, cogent, and convincing evidence the existence of one or more grounds for termination pursuant to section 7B-1111(a)." *In re C.B.C.*,

373 N.C. 16, 19 (2019) (cleaned up). We review the adjudicatory stage for termination

of parental rights "to determine whether the findings are supported by clear, cogent

and convincing evidence and the findings support the conclusions of law." *Id.*

> On appeal, this Court reviews only those findings
> necessary to support the trial court's determination that
> grounds existed to terminate respondents' parental rights.
> A trial court's finding of fact that is supported by clear,
> cogent, and convincing evidence is deemed conclusive even
> if the record contains evidence that would support a
> contrary finding. Further, findings of fact not challenged
> by respondents are deemed supported by competent
> evidence and are binding on appeal.

*In re G.D.C.C.*, 380 N.C. 37, 40 (2022) (cleaned up).

## A.

We begin with consideration of whether the trial court erred by concluding both

respondent-mother's and respondent-father's parental rights should be terminated

pursuant to section 7B-1111(a)(1). Section 7B-1111(a)(1) states,

> The court may terminate the parental rights upon a finding
> of one or more of the following: (1) The parent has abused
> or neglected the juvenile. The juvenile shall be deemed to
> be abused or neglected if the court finds the juvenile to be
> an abused juvenile within the meaning of G.S. 7B-101 or a
> neglected juvenile within the meaning of G.S. 7B-101.

N.C.G.S. § 7B-1111(a)(1) (2023). A juvenile is considered abused in part if the "parent

. . . inflicts or allows to be inflicted upon the juvenile a serious physical injury by other

than accidental means; [or] creates or allows to be created a substantial risk of serious

physical injury to the juvenile by other than accidental means." N.C.G.S. § 7B-

101(1)(a), (b) (2023). A juvenile is neglected in part if the "parent . . . does not provide proper care, supervision, or discipline, [or] [h]as abandoned the juvenile . . . or creates or allows to be created a living environment that is injurious to the juvenile's welfare." N.C.G.S. § 7B-101(15)(a), (b), and (e) (2023).

> Evidence of neglect by a parent prior to losing custody of a child—including an adjudication of such neglect—is admissible in subsequent proceedings to terminate parental rights. The trial court must also consider any evidence of changed conditions in light of the evidence of prior neglect and the probability of a repetition of neglect.

*In re B.R.L.*, 381 N.C. 56, 58–59 (2022) (cleaned up). "Additionally, a parent's failure to make progress in completing a case plan is indicative of a likelihood of future neglect." *Id.* at 59 (cleaned up). With this in mind, we consider respondents' arguments concerning the court's determination the grounds of abuse and/or neglect existed to terminate their parental rights.

**1.**

Respondent-mother challenges multiple findings of fact as unsupported by clear, cogent, and convincing evidence. Prior to consideration of the challenged findings, we consider the unchallenged findings to determine whether these findings alone support the trial court's determination of neglect pursuant to section 7B-1111(a)(1). The trial court included the following unchallenged findings specific to respondent-mother:

10. This [c]ourt adjudicated [Thomas] to be both an abused and a neglected juvenile in a hearing held on August 21, 2023. At four months old, [Thomas] was diagnosed at Brenner's Children's Hospital on April 11, 2023, as having suffered:

- An occipital skull fracture,

- Brain hemorrhaging,

- Facial bruising,

- A broken left wrist,

- A broken forearm, and

- 13 broken ribs.

11. At [Thomas's] disposition hearing held on August 21, 2023, and despite [Thomas's] significant and near-fatal injuries for which [respondent-mother] could not provide a reasonable explanation to Brenner's Children's Hospital medical personnel, this [c]ourt set forth a case plan by which [respondent-mother] and [respondent-father] could reunite with [Thomas].

12. This [c]ourt ordered that should [respondent-mother] wish to reunite with [Thomas], among other things, she would need to participate in her substance abuse and mental health treatment at Daymark, complete a domestic violence assessment and follow any recommendations, complete a parenting course and demonstrate the skills she learned during her visits with [Thomas], demonstrate sobriety by submitting to random drug screens when requested by [DSS], and provide a reasonable explanation to the [c]ourt as to how [Thomas] received his significant and near-fatal injuries.

13. At [Thomas's] first permanency planning hearing held on November 6, 2023, the [c]ourt found as to the above-mentioned aspects of her case plan since the disposition hearing held on August 21, 2023, that [respondent-mother]:

    . . .

b. had not completed a domestic violence assessment nor completed any domestic violence classes,

. . .

d. had not submitted to any of the three random screens requested by [DSS] in August, September, and October 2023, and

e. was still blaming Ms. Marisol Gomez for injuring [Thomas], taking no responsibility for herself for either injuring or allowing [Thomas] to be injured by someone else in whose care she left [Thomas], and had provided shifting explanations for what caused [Thomas's] injuries.

14. The [c]ourt also found at [Thomas's] November 6, 2023, permanency planning hearing that [respondent-mother]:

a. was pregnant and continued to smoke marijuana, and

b. had been charged with felony organized retail theft and had brought clothing items to her visits with [Thomas] with the security sensor still on some of the items.

15. Ultimately, the [c]ourt determined at [Thomas's] first permanency planning hearing that:

a.[respondent-mother] and [respondent-father], who remained incarcerated since the adjudication and disposition hearings, were acting inconsistently with their constitutional right to parent [Thomas.]

. . .

16. During [Thomas's] ongoing DSS case, [respondent-mother] gave birth to [S.R.], who subsequently came into DSS custody.

17. This [c]ourt adjudicated S.R. to be both an abused and a neglected juvenile in a hearing held on March 6, 2024. Among other findings, this [c]ourt found that:

. . .

b. S.R.'s putative father . . . is a registered sex offender who was convicted of three counts of rape and spent 21 years in prison.

c. In addition to using marijuana regularly during her pregnancy with S.R., [respondent-mother] also used cocaine on at least one occasion in November 2023, several weeks before S.R.'s premature birth.

d. [respondent-mother] reported to law enforcement on or about November 15, 2023, that she had invited a man to her home to smoke marijuana and have sex. She met the man a few days prior. She reported that he made her consume cocaine and made her have sex with him.

e. After making the report to police, [respondent-mother] refused to assist Detective Warren with the Special Victims Unit of the Winston-Salem Police Department with her investigation into the incident.

. . .

(2) [respondent-mother] refused to participate in the criminal investigation despite the man having told her that he works at a daycare in Virginia.

(3) [respondent-mother] refused to provide the [c]ourt with the man's legal name or even a nickname, testifying non-credibly that she did not call him by any name, even when she saved his phone number in her contacts.

. . .

19. [respondent-mother] is still not regularly attending her group therapy at Daymark for substance abuse and mental health treatment. She was discharged from group therapy at Daymark on June 25, 2024, due to having three consecutive no-shows.

20. [Respondent-mother] is still not regularly participating in her medication management at Daymark. She missed an appointment for medication management on June 6, 2024,

rescheduled it for June 22, 2024, and then told the provider on June 22, 2024, that she was not taking her prescribed medication because she was pregnant, even though her medications had already been adjusted to accommodate the safety of her pregnancy.

21. A drug screen that [respondent-mother] submitted to on January 10, 2024, was positive for marijuana in her urine and marijuana, cocaine, and methamphetamine in her hair.

. . .

30. [respondent-mother] has previously identified [respondent-father] as a person who abused her. She testified during the April 17, 2024, permanency planning hearing that she does not want to get back together with [respondent-father]. The court found her assertion non-credible due to the frequency of her contact with [respondent-father].

. . .

33. [Respondent-mother] admitted during cross-examination at the April 17, 2024, permanency planning hearing that [Thomas] was in fact in her vehicle during the April 6, 2023, traffic accident form which she fled and later pled guilty to Felony Hit and Run Causing Injury.

   a. Approximately 20 seconds after making her admission, [respondent-mother] denied on the stand that [Thomas] was in her vehicle during the hit and run vehicle accident. The [c]ourt found her subsequent denial non-credible.

   b. At this TPR hearing, [respondent-mother] repeated her denial that [Thomas] was in her car during the hit and run car accident from which she fled. The [c]ourt continues to find her denial not credible given her previous multiple admissions to [Thomas] being in the car at the time of the hit and run car accident.

34. [Respondent-mother] has continued to use illicit substances since S.R. and [Thomas] were removed from her

care.

There are additional unchallenged findings beyond these. These unchallenged findings demonstrate respondent-mother is still using illicit substances, she has not given the court an adequate explanation for the serious and nearly fatal injuries Thomas sustained, she continues to associate with unsafe individuals, and she has shown little to no progress on her case plan. The portion of her case plan that she did follow was inconsistent. Suffice to say, we do not need to address the challenged findings, as the unchallenged findings provide overwhelming evidence to support the trial court's determination that Thomas is neglected and abused pursuant to section 7B-1111(a)(1). Therefore, the trial court did not err in determining grounds existed to terminate respondent-mother's parental rights pursuant to section 7B-1111(a)(1). Having determined grounds existed pursuant to section 7B-1111(a)(1), we do not consider respondent-mother's challenges to the additional grounds that the trial court determined support termination of her parental rights.

**2.**

Next, we consider respondent-father's challenge to the trial court's determination grounds existed to terminate his parental rights pursuant to section 7B-1111(a)(1). Respondent-father challenges findings of fact 27, 28, 39, 40, 41, 42, 43, 44, 46, 48, 49, 50, 51, 53, and 64. He asserts findings of fact 46, 50, and 53 are essentially conclusions of law and should be reviewed as such on appeal. Respondent-father asserts these challenged findings are insufficient to support grounds for

termination of his parental rights because they are "based entirely on his incarceration." We disagree with respondent-father's interpretation of these findings.

While a sole finding of incarceration is inadequate to support grounds of neglect, it is not completely irrelevant to the consideration of termination of parental rights. "A parent's incarceration may be relevant to the determination of whether parental rights should be terminated, but our precedents are quite clear—and remain in full force—that incarceration, standing alone, is neither a sword nor a shield in a termination of parental rights decision." *In re K.N.*, 373 N.C. 274, 282 (2020) (cleaned up). The finding alone is insufficient, but "the extent to which a parent's incarceration . . . support[s] a finding of neglect depends upon an analysis of the relevant facts and circumstances, including the length of the parent's incarceration." *Id.* at 283.

The findings discuss respondent-father's incarceration in context. For instance, finding 28 recognizes respondent-father is employed and that he has received no infractions during his incarceration. Finding 29 discusses respondent-father's "constant" communication with respondent-mother while incarcerated, and finding 27 discusses respondent-father's failure to make any progress on his case plan while incarcerated. These findings contextually show what he has and has not accomplished while incarcerated. Finding 39 provides analysis of the duration of his incarceration; our Supreme Court noted the length of incarceration is relevant when

determining whether neglect is a ground for termination. *Id.* Finding 40 uses his incarceration contextually to establish respondent-father did not inflict Thomas's injuries. Respondent-father does not challenge the substance of the findings apart from the discussion of his incarceration in each finding. We treat the remainder of each finding as unchallenged and binding on appeal.

These findings support the trial court's conclusion that pursuant to section 7B-1111(a)(1) a ground existed to support termination of his parental rights. Respondent-father made no progress on his case plan despite the classes and resources available during his incarceration. The record supports these findings. The record also supports the finding of communication between respondent-mother and respondent-father, and the domestic violence on respondent-father's part. Apart from at least one letter sent, respondent-father made no efforts to reunify himself with Thomas. As a result, the trial court did not err by determining the ground of neglect existed pursuant to section 7B-1111(a)(1) to support termination of respondent-father's parental rights. We do not consider the additional grounds for termination because the conclusion that one ground exists is determinative during the adjudicatory stage to support termination of parental rights.

**B.**

Finally, respondent-mother seeks remand to correct an alleged clerical error. Respondent-mother argues the trial court clerically erred by including a finding of a ground for termination pursuant to section 7B-1111(a)(2). However, because the

existence of one ground for termination is sufficient to proceed to disposition and ultimately terminate parental rights, we do not address this additional argument. The trial court properly determined a ground existed pursuant to section 7B-1111(a)(1) to terminate respondent-mother's and respondent-father's parental rights.

**III.**

For the foregoing reasons, the trial court's findings of fact support its conclusion that a ground exists to terminate respondent-mother's and respondent-father's parental rights pursuant to section 7B-1111(a)(1). Respondents did not appeal the disposition stage of the termination proceedings. Accordingly, we affirm the trial court's order terminating respondent-mother's and respondent-father's parental rights.

AFFIRMED.

Judges STROUD and HAMPSON concur.

Report per Rule 30(e).